320 So.2d 84

**Jerry Wayne FISH**

v.

**STATE.**

**8 Div. 468.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1975.

Joe Gilliland, Russellville, for appellant.

William J. Baxley, Atty. Gen., and C. Lawson Little, Asst. Atty. Gen., for the state.

HARRIS, Judge.

Appellant was put to trial upon a two-count indictment charging, (1) murder in the first degree, and (2) robbery. Prior to arraignment he was found to be indigent and counsel was appointed to represent him. He pleaded not guilty. The jury returned a verdict finding him guilty of murder in the first degree and fixed his punishment at life imprisonment in the penitentiary. The jury also found him guilty of robbery and fixed his punishment in the penitentiary for a term of ten years. He was furnished a free transcript and trial counsel was appointed to represent him on appeal.

This was a cold-blooded murder perpetrated in the robbery of a service station attendant on Sunday night, May 27, 1973, near Russellville, in Franklin County, Alabama. The attendant, J. W. Brown, was shot twice with a .22 caliber rifle and was found dead inside the station the next morning about 6:30 by Mr. Earl McCluskey, the manager of the Red Ace Petroleum Company. An inventory was made and it revealed that $189.59 was missing consisting on $119.54 in checks, $10.30 in credit cards and $59.75 in cash.

Mr. Joe Newton, the Coroner of Franklin County, was called to the scene of the homicide and found the deceased lying on the floor behind the counter and pronounced him dead. The body was removed to the Spry Funeral Home and an autopsy was performed by Mr. Van Pruitt, Assistant State Toxicologist in charge of the Huntsville Division. The clothing of the deceased was removed from the body by the coroner before the autopsy and turned over to the Sheriff of Franklin County.

Mr. Van Pruitt described the autopsy as follows:

"A    Wound number 1 was in the left upper abdomen this being the area of the abdomen a measured distance of one and three-quarters inches to the left of the midline and six inches below the horizontal line which would be the approximate location indicated by the tip of my finger.  The other was in the right back and was located three and one-half inches to the right of the midline of the body and one and one-half inches below the horizontal of the axle which would be the approximate area of the tip of my finger.

"Q    Let's refer to the abdomen.  Was that an entrance or exit one?

"A    Entrance.

"Q    Did you probe that wound?

"A    I didn't probe it no sir.

"Q    The wound in the back was that an entrance or exit wound?

"A    It was an entrance wound.

"Q    Did you follow the path of that wound or the bullet that made that wound?

"A    I followed the path yes sir.

"Q    Were any bullets removed from this body at the time you performed your autopsy?

"A    Yes sir.

"Q    How many and just describe what you removed from the body please?

"A    I removed a single projectile which was in the right plural cavity.  The path of the projectile was traced from the wound in the left abdomen which ranged in respect to the body from left to the right slightly upward past across the border of the liver, a major vessel of the liver, the lung, and it struck the sixth interspace which would be the space between ribs six and seven in the right plural cavity in the back.

"Q    The path of the bullet you have just traced was that the wound on the front or back of the body?

"A    The one in the left abdomen anteriolly, front.

"Q    You say you recovered a projectile that would be the same as a bullet or slug or something like that?

"A    A slug, a bullet.

"Q    Were you able to determine what caliber that bullet was?

"A    It appeared to be a 22 caliber.  I did not mike it or examine it in detail at that time.

"Q    What was the size of the hole there in the left abdomen.  Did you measure it?

"A    It measured one-quarter of an inch in diameter which a prorifiral abrasion color.

"Q    What do you mean by that?

"A    An abrasion is a skinned place and when a small skin area or denuted area surrounds the prorifory of the wound this indicates it being a wound of entry and the cause of the abrasion is the spinning of the projectile as it penetrates the flesh.

"Q    The bullet going in as it spins around will cause the tissue to break or split?

"A    Its not split its a skinned place actually something like if you fell and skinned your knee but it circles the wound.

"A    On the back—well first of all did you measure the diameter of the wound in the back?

"A    Yes sir.

"Q    What was that measurement please sir?

"A    One-half inch in its breadth.

"Q Could you tell the jury then the path of that bullet?

"A From the point of the back the projectile ranged through the tenth interspace which would be the muscle between the ribs numbered ten and eleven and in respect to the body it ranged upward through the musculature and into the upper medius-stynal area which is the mid portion about the base of the neck and at that point its path transversed the subclavian artery, it severed it, which is the artery located in the base area of the neck and then into the back portion of the larynx or the voice box or what is commonly called I think the adams apple in everyday language and from that point its path was traced into the upper portion of the larynx and the pharnyx which is the back of the mouth and at that point the path was lost. There was no other disruption of tissue in the area so that the head was X-rayed by me at that time and no projectile was found in the head area. The neck was X-rayed again in detail and there was no lead or solid material found in that area. Each of the organs which I had recovered from the body was X-rayed and no solid mass was obtained in that portion so I concluded based upon this and no other path that the projectile exited the mouth.

"Q What if anything did you do with the bullet that was recovered from the entrance wound in the abdomen?

"A It was secured by me and returned by me to the laboratory, my laboratory in Huntsville and I then turned the slug or projectile over to an employee, Mr. Brant Wheeler, a criminolist in my office for examination and comparison.

"Q Mr. Pruitt, based on your background and your training and your experience, do you have a judgment as to the cause of death of this victim.

"A Yes sir.

"Q What is that judgment please sir?

"A Multiple gunshot wounds as I have described which resulted in injury to various organs and hemorrage into the cavities.

"Q Do you have a judgment as to what kind of gunshot wound it was?

"A The projectile as I have described which was recovered from the chest cavity was of the approximate 22 caliber. The projectile in the back at its point of entry effected a somewhat larger opening than would be normally encountered by a 22 caliber however, due to the irregularity of the wound and the absence of clearly defined abrasions and irregularity of the wound it would seem that the projectile may have made impact with some other object prior to the time it made impact with the body and for these reasons I am not able to positively ascertain the caliber of that projectile.

"Q You said it was a 22 caliber projectile that caused the wound in the abdomen, was this a rifle or a revolver type of weapon?

"A It could be either."

Mr. McCluskey further testified that there was a bullet hole in one of the windows to the station and on the desk he found a written shift report and a pad with the license number and description of an automobile all in the handwriting of the deceased.

Photographs were made of the scene showing the exterior of the station and there were photographs of the interior of the station showing the body of J. W. Brown, the shift sheet and the pad on which the deceased had written the tag number and description of an automobile. On the pad was the notation, "62 White Buick 4 door—20–10683."

Mr. Gale Cummins and his wife Betty drove a flatbed truck to the Red Ace Service Station where the homicide occurred to get gas. When they arrived, they saw an old White model automobile parked a

short distance from the gas pumps. The rear of this car was to the front door of the service station. This car had the hood up and they saw two young white men around the car and one of them was putting water in the old White model car. The time was between 10:30 and 11:00 o'clock on Sunday night, May 27, 1973. The outside of the station was well lighted. They both got a good look at these two men and described one of them as having a short haircut and the other one as being rough looking and had bushy hair that had been wet down. This was a self service station but the attendant came to the gas pumps to assist Mr. Cummins put gas in the saddle tanks to his truck. After the tanks were filled, Mr. Cummins went inside the station to get a cash receipt so that he could get reimbursed from his employer. While the attendant was writing out the receipt, he asked Mr. Cummins if he knew the two young white men outside saying they had been acting strange. Mr. Cummins told the attendant he was from Marion, Kentucky and did not know the men and suggested he get the tag number of their car. Mr. Cummins called off the tag number and Mr. Brown wrote it down on the pad that was found on the desk the next morning.

Both Mr. and Mrs. Cummins made a positive in-court identification of appellant as being one of the men they saw at the service station that night. Both testified they based their identification on seeing the men that night in a well lighted area and not on any photographs they were previously shown by any officials. While they were on the witness stand, the District Attorney called appellant's co-indictee to the door of the court room and both identified him as the other man they saw at the service station on Sunday night, May 27, 1973. The co-indictee was subsequently identified as Ronald Steve Heupel.

Mr. Heupel turned state's evidence and testified that he had known appellant four or five years. He stated that the 1962 Buick automobile which was observed at the Red Ace Service Station on the night of the homicide was his automobile. Before permitting him to testify the court warned him of his constitutional rights in the presence of his attorney and he told the court that he had discussed the matter with his attorney and his rights had been fully explained to him and he wanted to testify. He further told the court that he had not discussed being a witness with the District Attorney or any official connected with the case and had not been promised anything in exchange for his testimony.

According to Heupel's testimony he lived alone at Herne's Trailer Park in Florence, Alabama. That he met appellant on the afternoon of May 27, 1973, at Junior Johnson's house in Florence. At the Johnson house were Mr. and Mrs. Johnson, Pat Priest and a young man by the name of Junior Earl James. That he, appellant and James left the Johnson's house to go to Russellville. His car was running hot and he drove to the Red Ace Service Station to get water for the car. That he and appellant got out of his car to get the water and James stayed in the car. While they were at the station a red truck drove in to get gas in the saddle tanks. That they left the station and went to a drive-in. They saw a white car there and were afraid the watchman might shoot them so they left. Appellant said he planned to kill the service station attendant and said let's go back to the station. He drove near the station and appellant opened the glove compartment and pulled something that opened the trunk of the car. He thought appellant was going to get a lug wrench but he came out with a .22 caliber bolt-action rifle and told the witness to come back for him in ten to fifteen minutes. When he returned, he found appellant on the side of the road waiting for him. He had the .22 rifle in his hand and a bank bag. When appellant got in the car, he said, "I had to kill the ____ ____ ____ ____." Appellant tried to put the rifle under the

seat and Heupel told him to get rid of it. He told appellant he could ride but the gun wasn't going to stay in the car. Appellant took the bolt out of the rifle while they were going toward Sheffield and threw it out on the right side of the highway and then he threw the rifle out on the same side of the highway.

Heupel further testified that on the way back to Florence appellant unzipped the bank sack and pulled out some rolls of money and some dimes and quarters. There were some checks in the bank bag and appellant threw them out of the car. Appellant then started dividing the money. He gave Heupel and James ten dollars each and kept the rest of the money.

Later appellant told Heupel he shot the deceased twice to be sure he was dead and would not be able to recognize him. They got back to the Johnson house between 12:00 and 1:00 o'clock and James got in his car and left.

Pat Priest testified that she knew both appellant and Heupel and that they left the Johnson house some time on the afternoon of May 27, 1973, and did not return until some time after midnight. That the next day they were standing around drinking beer and that appellant started talking about killing a man at the Red Ace Service Station in Russellville. She said one of the men gave her $3.00 in dimes. That appellant said he shot the man twice because he didn't want to see him suffer, but later said he shot him twice because the man saw him and thought he could identify him.

A number of spent cartridges were found inside and outside the service station. They were turned over to the Toxicologist. A few days after the murder the .22 rifle was found in the grass about three feet from the paved portion of the highway but the bolt was not found.

Mr. Brent Wheeler, a criminologist with the Department of Toxicology at Huntsville, testified to his education and qualifications. He stated that on May 30, 1973, he received from Mr. Pruitt a spent .22 caliber slug identified by him as having been removed from the body of J. W. Brown.

This witness further testified:

"A June 1st 1973 at 11:50 a. m. I received—I am referring to my notes here—I received from Investigator Haney two 22 caliber spent cartridge cases identified by Investigator Haney as having been removed at the scene. Also I received from Mr. Haney one 22 caliber spent projectile identified as coming from the scene and on June 13 which is some two weeks later of the same year I received from Investigator Haney one Winchester 22 caliber bolt action type rifle model 69."

He further testified that he did not test fire the rifle for comparison with the slug and spent cartridges as the barrel of the rifle was bent and the bolt was missing. That he did examine the barrel of the rifle with the spent slug and spent cartridges and they had the same lands and grooves.

J. C. Hurston testified for the state. According to his testimony he was in the same cell with appellant in the Lauderdale County Jail. That the Funari brothers were also in the same cell and in the bullpen. He testified that he heard appellant telling the Funari brothers that he shot the attendant at the Red Ace Service Station. That he shot him in the back through a window and then went in and held the gun over his stomach and shot the old _____ through the stomach. He quoted appellant as saying, "blood was running out of the _____'s mouth and nose like a sprouting spring." He stated that appellant said he shot him with a .22 rifle and that it was his rifle. He further testified that no one connected with the District Attorney's office nor any law enforcement officials had asked him to seek any information from appellant.

Appellant did not testify but offered the testimony of the Funari brothers who testified that appellant made no such statements as testified to by J. C. Hurston.

In rebuttal the state called Mr. James Triplett who testified that he was an investigator for the District Attorney's office in Lauderdale County. Mr. Triplett stated that he knew both of the Funari brothers. He testified that he knew their general reputation in the community in which they lived and it was bad. He further testified that he knew their reputation in the community in which they lived for truthfulness and veracity and that reputation was also bad.

■ There was no motion to exclude the state's evidence; there was no motion for a new trial; there was no request for the affirmative charge; there were no exceptions reserved to the oral charge to the jury, and there was no error in the court's rulings on the admission of evidence. In this state of the record nothing is presented to this court for review. *Eady v. State,* 48 Ala.App. 726, 267 So.2d 516; *Grant v. State,* 46 Ala.App. 232, 239 So.2d 903; *Robinson v. State,* 46 Ala.App. 684, 248 So.2d 583.

■ Appellant got a fair and impartial trial and he was entitled to nothing more. The trial judge was more generous in his charge to the jury than the evidence in this case warranted. He charged the jury on the four degrees of homicide and this was wholly unnecessary under the facts in this heinous and cold-blooded murder.

The case is due to be affirmed and it is so ordered.

Affirmed.

All the Judges concur.